## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

RANDALL L. CHUMBLEY,            )
                                )
            Plaintiff,          )
                                )
vs.                             )       Case No. 2:10CV00026 AGF
                                )
MICHAEL J. ASTRUE,              )
Commissioner of Social Security,)
                                )
            Defendant.          )

## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Randall Chumbley was not disabled and, thus, not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, or Supplemental Security Income under Title XVI of the Act, *id.* §§1381-1383f.  For the reasons set forth below, the decision of the Commissioner shall be affirmed.

Plaintiff, who was born on October 6, 1954, filed his applications for benefits in January 2006, at the age of 52, alleging a disability onset date of November 1, 1999, due to neck and back pain, and arthritis.  After Plaintiff's applications were denied at the initial administrative level, Plaintiff amended his alleged disability onset date to January 9, 2006 (Tr. 170), and requested a hearing before an Administrative Law Judge ("ALJ").  Such a hearing was held on June 25, 2008.  By decision dated October 28, 2008, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform certain jobs

that were available in the national economy, and was therefore not disabled under the

Act.  Plaintiff's request for review by the Appeals Council of the Social Security

Administration ("SSA") was denied on February 17, 2010.  Plaintiff has thus exhausted

all administrative remedies and the ALJ's decision stands as the final agency action now

under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in

the record.  Specifically, Plaintiff argues that the ALJ did not accord proper weight to the

opinion of Plaintiff's treating physician (John Beckert, D.O.), improperly discredited

Plaintiff's subjective complaints, and failed to consider Plaintiff's obesity.  In addition,

Plaintiff asserts that the ALJ holds a known bias against Social Security disability

claimants who, like Plaintiff, are obese and allege mental problems.  Plaintiff asks that

the ALJ's decision be reversed and remanded for the award of benefits or for proper

consideration by a different ALJ.

## BACKGROUND

### Work History and Application Forms

The record indicates that Plaintiff worked as a refrigeration technician from 1988

to November 1, 1999, being self-employed in this trade during the last six years of his

employment.  From 1987 through 1996, his annual earnings ranged from approximately

$10,000 to approximately $34,000.  He attempted to work as a laborer in 2004, but could

not sustain the physical demand of the job and quit after two or three weeks.

In the Function Report section of his application for benefits, Plaintiff described

2

his daily activities as, "Turn on heating pad on knee, back.  Struggle to straighten up house, do laundry, sit or lay on couch due to pain.  Mainly do nothing."  He indicated that he had two dogs that he took care of, and that he used a cane when walking.  (Tr. 143-55.)  In the Disability Report section, Plaintiff wrote that he was 6' tall and weighed 224 pounds, and that he took Naprosyn and Tylenol for his back and leg problems.  (Tr. 127-33.)  In the Disability Appeal form requesting a hearing before an ALJ, the only medications listed by Plaintiff as ones he was currently taking were potassium citrate to reduce acid in his kidneys, and Aleve two to three times a day.  (Tr. 174.)

On January 26, 2006, an SSA interviewer indicated that she did not observe any significant problems with Plaintiff's ability to sit, stand, walk, or use his hands.  (Tr. 125.)

**Medical Record**

The record indicates that Plaintiff had surgery on his left knee in 1992.  The first medical reports of record are from late 2004/early 2005 when Plaintiff had a kidney stone removed.  At a follow-up appointment in October 2005, Plaintiff reported that he had no complaints.  (Tr. 202.)  Plaintiff saw John Beckert, D.O., on January 9, 2006, with complaints of progressively worse left knee pain and low back pain with walking, sitting, and standing.  Plaintiff tested positive for rheumatoid arthritis.  Dr. Beckert prescribed Naprosyn and routine follow-up.  (Tr. 233-35.)

At a consultative examination conducted on March 25, 2006, by Raymond Leung, M.D., in connection with Plaintiff's applications for disability benefits, Plaintiff

3

complained of low back pain and reported taking aspirin and occasionally Valium, to reduce his pain.  Plaintiff estimated that he could walk three blocks and lift 50 pounds. Upon examination, Plaintiff's blood pressure was 128/90 and he was in no apparent distress.  His gait was normal and he had no difficulty getting up from his chair or on and off the examination table.  His lungs were clear and his back was nontender.  Plaintiff exhibited crepitation in the left knee and minimal nodes in his hands, but he had full range of motion in all extremities, 4/5 strength in his left leg, and full strength in his right leg and upper extremities.  Dr. Leung diagnosed arthritis of the low back, and opined that Plaintiff did not require an assistive device to walk, but may have difficulty with prolonged walking, climbing, bending, squatting, and lifting.  (Tr. 242-46).

On June 6, 2006, Plaintiff saw Richard Shaffer, D.O., and reported a history of arthritis, hepatitis, and a kidney stone.  He rated his pain as ten, on a scale of one to ten, but denied experiencing any gait, strength, or balance problems.  Plaintiff also denied any mood or memory problems.  (Tr. 322.)

On September 15, 2006, Plaintiff saw Sunita Penmatcha, M.D., a rheumatologist, and reported pain in his hands, left ankle, left knee, and buttocks.  Plaintiff told Dr. Penmatcha that he had been depressed five or six years earlier, but that had resolved with treatment.  He was taking Ibuprofen for his pain.  Upon examination, Plaintiff had no motor or sensory deficits and his gait was normal.  He had a trigger finger in his right hand, but his inflammatory markers were normal and he had full range of motion in all joints.  Dr. Penmatcha diagnosed asymmetric polyarticular arthritis with no clear etiology

4

for Plaintiff's complaints.  She opined that Plaintiff did not require a follow-up visit, and recommended Tylenol for pain.  (Tr. 296-98.)  X-rays of Plaintiff's hands were normal. (Tr. 272.)

On October 30, 2006, Plaintiff established care with Mike Hackmann, M.D. Plaintiff complained that his fingers were locking up and that he had low back, left knee and hip, and ankle pain, for which he was taking Ibuprofen three times a day.  Upon examination, Plaintiff had full range of motion in all his fingers, although on occasion, his right middle finger locked upon flexing.  Dr. Hackmann diagnosed intermittent arthralgias, noting that there was no clinical evidence of inflammatory arthritis.  Plaintiff was instructed on the risks of obesity and was counseled to lose weight and increase his daily physical activity.  (Tr. 312-15.)

On January 25, 2007, Plaintiff met with Phillip Velderman, M.D., for a routine medical exam and reported experiencing back pain and finger stiffness in the morning. Plaintiff told Dr. Velderman that Aleve was very helpful, but that he had run out of it.  He denied joint swelling and had a full range of motion in his hips and back.  Dr. Velderman diagnosed osteoarthritis of the hands.  The same day, Plaintiff also met with Scott Vogelgesang, M.D., whom he told that he walked several miles a day and was independent in self-care and household activities.  Plaintiff exhibited a chronic limp, but did not require an assistive device.  Dr. Vogelgesang recommended eight weeks of physical therapy.  (Tr. 305-06.)

Treatment notes from Dr. Beckert dated February 26, 2007, state that Plaintiff had

been given Hydrocodone for pain, but that medications were not helping.  (Tr. 59.)  On

March 5, 2007, Plaintiff saw orthopedist Peter Buchert, M.D., upon referral by Dr.

Beckert.  Dr. Buchert opined that Plaintiff had severe arthritis in his knee and "some"

arthritis in his  back.  (Tr. 270-71.)  On July 16, 2007, Plaintiff returned to Dr. Beckert

and reported that he had difficulty with ambulation and was unable to bear full weight on

his left knee.  Dr. Beckert opined that Plaintiff needed surgery to repair the left knee, and

that "short of this, [Plaintiff] is not going to ambulate and be employable at this time."

(Tr. 259.)

On September 19, 2007, Dr. Beckert completed a physical RFC form for Plaintiff.

Dr. Beckert opined that Plaintiff had no psychological conditions, but had severe

degenerative disc disease of his left knee, and severe pain with ambulation.  Dr. Beckert

indicated that Plaintiff could not sit or stand for any amount of time and could not walk

even one block without rest or severe pain.  Dr. Beckert further opined that Plaintiff could

not lift any amount of weight, could rarely look down or turn his head, and could never

twist, stoop, crouch, squat, climb stairs or ladders, or use his hands, fingers, or arms to

reach overhead, grasp, turn, twist objects, or perform fine manipulations.  Dr. Beckert

concluded that Plaintiff could not perform any work and that his limitations had been

present since 1996.  (Tr. 255-58.)

On January 30, 2008, Plaintiff saw James Grote, M.D., for follow up.  Dr. Grote

diagnosed osteoarthritis, with no evidence of systemic disease.  Plaintiff had a normal

unassisted gait, normal range of motion in all joints, and normal strength in all

extremities.  His mood, affect, insight, and judgment were all appropriate, and his

depression screening was negative.  Plaintiff was again instructed to lose weight and

increase his daily physical activities.  (Tr. 342-47.)

At a follow-up appointment with Dr. Grote on April 30, 2008, Plaintiff reported

that he felt achy and tired after moving his belongings out of a flood area.  Upon

examination, Plaintiff again had appropriate insight, judgment, mood, and affect.  His

blood pressure was 161/113.  He was diagnosed with hypertension and again instructed to

increase his daily activity level.  (Tr. 335-37).  An x-ray of Plaintiff's right hand showed

no bone or joint abnormality.  (Tr. 327).  An x-ray of his knees showed joint space

narrowing and osteophyte formation, but Plaintiff had normal bone density and no joint

erosion.  (Tr. 328).

On August 16, 2008, Plaintiff had another consultative examination with Dr.

Leung.  Plaintiff complained of lower back and left knee, ankle, and hip pain, and stated

that Tylenol reduced his pain.  He exhibited crepitation in his left knee and mild nodes in

his hands; his range of motion was 135/150 degrees and his gait was normal.  He could

tandem walk and squat three-fourths of the way down.  Plaintiff had 4/5 strength in his

left leg and full strength in his right leg, arms, and hands.  Dr. Leung opined that Plaintiff

did not require an assistive device to walk; could sit for eight hours; stand for two hours

at a time, up to four hours in an eight-hour workday; and walk for one hour at a time, up

to two hours in an eight-hour workday.  Plaintiff could never climb stairs, ramps, ladders,

or scaffolds, but could frequently balance, and occasionally stoop, kneel, crouch, and

7

crawl.  Dr. Leung also opined that Plaintiff could never operate a motor vehicle or work around unprotected heights or moving mechanical parts.  (Tr. 351-61.)

**Evidentiary Hearing of June 25, 2008 (Tr. 18-51)**

Plaintiff, who was represented by counsel, testified that he was 53 years old and living in a camper at his daughter's farm for the past two years, after flood waters surrounded the house he had been living in.  He had a GED and had completed vocational training in refrigeration.  Other than working as a laborer for two or three months in 2004, he had not worked since 1999 because he had knee problems and did not have the money for pain medicine.  Then, in 2004 or 2005, he started to go to the VE hospital and clinic, after a friend advised him he had a right to go there.

Plaintiff had worked at a refrigeration company until it closed in 1993, at which point he started his own business in commercial refrigeration.  In 1999, he quit his business because, due to his knee problems, he could no longer do the 80-100 pounds lifting that was required and he could not find anyone to help.  Nor could he hold a wrench or get down on his knees.  He became depressed because he could no longer work, after having been successful at it.

Plaintiff testified that he was currently being treated at the VA clinic where he was put on a 500-milligram pain pill that helped, but that he was advised by an orthopedist that he really needed knee replacements.  X-rays had recently been taken of his knees, but he did not know the results.

Plaintiff testified that generally, he would get up at about 6:30 or 7:00 a.m. and

8

either take the four-wheeler around his daughter's farm to see if the fences are up or watch his grandchildren who ranged in age from 7 to 15.  He spent most of his day in the house and when it rained, he did not go out at all because the arthritis in his hands and knees flared up and he could not get around well.  He was not supposed to take extra pain medication when his arthritis flared, but could take Tylenol, which helped only temporarily. When Plaintiff was not at the farm, he spent his days reading and watching television.  He would take laundry to his daughter's house, and occasionally washed the dishes because this loosened his fingers up.  He had a few friends he visited occasionally, and usually went to bed at about 8:30 p.m.

Plaintiff stated that he used to belong to a group that played cards, but he could no longer see the cards, and gas to drive to where the group played was too expensive.  His only hobby was taking his grandchildren fishing in ponds.  He only wore slip-on shoes, wore knee braces daily, sometimes wore an ankle brace, and used a walking stick. Plaintiff estimated that he could be on his feet for two or three hours at the most before his left knee started to swell.  He could not sit for longer than an hour without getting stiff as a result of his bad left knee, which caused the muscles in his hip to knot up if he sat or stood any longer.

Plaintiff testified that he could lift a 40-pound salt block, but not too many of them.  His doctors told him that they were experimenting with him to see what pain medication would help.  Ibuprofen did not help at all and he was just recently started on Tramadol.

9

Plaintiff testified that he weighed 230 pounds, which was up about 25 pounds from his normal weight.  He owned a vehicle, but had difficulty driving it because he could not push the clutch in well due to his left knee problem.  According to Plaintiff, his left knee currently had three bone spurs and the pain went up and down his leg from his ankle to his hip.  His right knee had only two bone spurs and the pain on the right side was concentrated in the knee.  His knees hurt more when the weather was damp.  He had pain daily, even if he did not do anything.  Aside from the pain medication, he used a vibrating heating pad at least once a day.

Plaintiff testified that he could not carry 20 pounds repeatedly, but could possibly do so with 10 pounds.  He had difficulty bending over and straightening back up, and kneeling, but not with reaching and extending his hands over his head.

The ALJ stated that just based on Plaintiff's testimony at the hearing, Dr. Beckert's September 19, 2007 RFC assessment of Plaintiff's limitations was "somewhat apocryphal," and that he (the ALJ) would have to assess his own RFC.  He asked the VE to consider an individual of Plaintiff's age, education, and work experience, who could lift 20 pounds on occasion and 10 pounds frequently; stand six out of an eight-hour workday with normal breaks; had to avoid operating foot controls repetitively or constantly with the bilateral lower extremities; could climb ramps and stairs, but not ladders, ropes, or scaffolds; could not kneel or crawl; could occasionally stoop and crouch, squat a little, and bend at the waist; and had to avoid working at unprotected heights and around unprotected dangerous machinery.  The VE testified that such an

10

individual could not do Plaintiff's past work, but could perform unskilled light jobs[1] such as convenience store cashier without heavy stocking, or bench assembly without the use of lower extremities, and that these jobs existed in significant numbers in the national and local economies.

If the hypothetical person were limited to standing or sitting for only one hour at a time and then needed to change positions for a period of time before resuming sitting or standing, he could still perform the convenience store cashier job but not the assembly job.  If the person could stand for two hours out of eight and sit for at least six hours out of eight, but could only lift 10 pounds, the person could only do assembly-type sedentary work.  Adding the need for a sit-stand option throughout the day with a maximum sitting or standing time of one hour without changing position would preclude assembly work, but not a security system monitor position, a position which also existed in significant numbers in the national economy.

The VE further testified that if a person were to miss more than two days a month for successive months for medical reasons, competitive employment would be eliminated.

_____

[1]    Light work is defined in 20 C.F.R. § 404.1567(b) as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of up to ten pounds; and that might require a good deal of walking or standing, sitting most of the time, and some pushing and pulling of arm or leg controls.  Social Security Ruling 83-10, 1983 WL 31251, at *6, elaborates that light work requires standing or walking, off and on, for a total of approximately six hours of an eight hour work day, while sitting may occur intermittently during the remaining time; that the lifting requirement generally required occasional, rather than frequent, stooping; and that for many unskilled light jobs, the ability to stand was more critical than the ability to walk.

If the person needed to consistently leave work early, come to work late, or be away from the work setting at least the equivalent of an additional break during the day at least once a week, competitive employment would be eliminated.  The ALJ stated that he was going to send Plaintiff for a physical consultative exam, and concluded the hearing.

**ALJ's Decision of October 28, 2008 (Tr. 7-17)**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of November 1, 1999, and had the severe impairments of arthritis to the low back, left hip, left knee, left ankle, and hands, but that none of these impairments, individually or in combination, equaled a deemed-disabling impairment listed in the Commissioner's regulations.

The ALJ summarized the medical evidence, concluding that it failed to "fully support" Plaintiff's allegations about the severity of his work-related limitations.  The ALJ found that Plaintiff had the RFC to perform light work except for the following restrictions: He needed the option to change positions after sitting and/or standing for one hour; he could not operate bilateral foot controls repetitively or constantly; he could no more than occasionally climb ramps and stairs and stoop and crouch; and he could not climb ladders, ropes, or scaffolds, or kneel or crawl.

In support of this RFC assessment, the ALJ pointed to some of Plaintiff's statements in the record regarding his daily activities, and concluded that they were "not fully consistent" with Plaintiff's allegations of his work-related limitations.  The ALJ also referenced the SSA interviewer's January 26, 2006 indication that she did not observe

any significant problems with Plaintiff's abilities to sit, stand, walk, and use his hands; as well as Plaintiff's statement on his January 2006 Disability Report that he was not taking any medications, and the lack of medical treatment from February 2005 through December 2005.

The ALJ explained that he did not give Dr. Beckert's September 2007 opinion "much deference" because it was "not well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] inconsistent with other substantial medical evidence in the case record."  According to the ALJ, this opinion was inconsistent with Dr. Buchert's failure to note in March 2007 that Plaintiff had difficulty with ambulation, after which time Dr. Beckert did not see Plaintiff again for an examination of his arthritis; with Dr. Grote's notation in January 2008 that Plaintiff had a normal, unassisted gait, and normal muscle strength; and with Plaintiff's report (to Dr. Vogelgesang) in January 2007 that he walked several miles a day.

More specifically, in support of his assessment of Plaintiff's lifting and carrying abilities, the ALJ relied on Plaintiff's testimony at the hearing and Dr. Leung's evaluation.  And in support of his assessment that Plaintiff could stand and walk for a total of six hours a day, the ALJ stated that several examiners had observed that Plaintiff had a normal gait without the assistance of a cane; that Plaintiff did laundry and moved items out of his house; and again, that Plaintiff reported in January 2007 that he walked several miles a day.

The ALJ concluded that Plaintiff could not perform his past work, but, based on

13

the testimony of the VE, that he could perform the work of a cashier at a convenience

store, and was thus not disabled under the Social Security Act.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court "must review

the entire administrative record to 'determine whether the ALJ's findings are supported

by substantial evidence on the record as a whole.'"  *Johnson v. Astrue*,  628 F.3d 991,

992 (8th Cir.  2011).  The court "'may not reverse . . . merely because substantial

evidence would support a contrary outcome.  Substantial evidence is that which a

reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (citations

omitted); *see also Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that

the concept of substantial evidence allows for the possibility of drawing two inconsistent

conclusions, and therefore, embodies a "zone of choice," within which the Commissioner

may decide to grant or deny benefits without being subject to reversal by the reviewing

court).

To be entitled to benefits, a claimant must demonstrate an inability to engage in

substantial gainful activity which exists in the national economy, by reason of a medically

determinable impairment which has lasted or can be expected to last for not less than 12

months.  42 U.S.C. § 423(d)(1)(A).  The Commissioner has promulgated regulations,

found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to

determine disability.  The Commissioner begins by deciding whether the claimant is

engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a severe impairment or combination of impairments.  If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in Appendix I.  If not, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work.  If so, the claimant is not disabled.  If he cannot perform his past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors -- age, education, and work experience.  *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).

**Weight Accorded by the ALJ to the Opinion of Plaintiff's Treating Physician**

Plaintiff argues that the ALJ improperly gave no weight to Dr. Beckert's September 19, 2007 RFC assessment that Plaintiff could not perform sedentary work. The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area.  20 C.F.R. § 404.1527(d).

The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by

15

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2). The statements of a treating physician may be discounted, however, if they are inconsistent with the opinions of other physicians, the claimant's testimony, or the overall record. *Perkins v. Astrue*, 2011 WL 3477199, at *3 (8th Cir. August 10, 2011); *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011); *Medhaug v. Astrue*, 578 F.3d 805, 815-16 (8th Cir. 2009).

As discussed above, Dr. Beckert opined that Plaintiff could not lift any amount of weight, walk even one city block, stand or sit for any amount of time, use his hands to perform fine or gross manipulations, and reach over his head. These findings are inconsistent with Plaintiff's testimony that he had no difficulty reaching or extending his arms above his head, and could walk two to three hours at a time, sit up to one hour at a time, and lift up to 40 pounds. Dr. Beckert's opinion that Plaintiff's extreme limitations had been present since 1996 is inconsistent with the fact that Plaintiff continued to work until 1999. And, as the ALJ noted, the limitations outlined by Dr. Beckert, were inconsistent with other contemporaneous medical evidence showing that Plaintiff had a normal gait and good strength and range of motion in his extremities. As noted above, as late as August 2008, Dr. Leung found that Plaintiff had a normal gait and could sit up to eight hours a day, stand up to four hours a day, and walk up to two hours a day. Moreover, the medical record documents only infrequent treatment visits to Dr. Beckert. *See Casey v. Astrue*, 505 F.3d 687, 693 (8th Cir. 2007) (holding that the ALJ acted within

16

the acceptable zone of choice in declining to credit treating physician's opinion where treating relationship was sporadic).

In sum, the Court concludes that the ALJ properly evaluated the record as a whole and was warranted in discrediting Dr. Beckert's September 19, 2006 RFC assessment. *See, e.g., Perkins,* 2011 WL 3477199, at *3 (holding that ALJ was not required to give controlling weight to treating physician's opinions that were inconsistent with other relevant evidence); *Medhaug*, 578 F.3d at 815-16 (holding that ALJ properly discredited letter from the plaintiff's treating physician that the plaintiff could not sit for a long period of time without getting up to move around, and could not hold a full time job, where this opinion was contradicted by the plaintiff's testimony at the evidentiary hearing, and two other examining physicians); *Goff v. Barnhart*, 421 F.3d 785, 790-91 (8th Cir. 2005).

## ALJ's Evaluation of Plaintiff's Credibility

Plaintiff argues that the ALJ erred in relying on Plaintiff's minimal daily activities to support the ALJ's finding that Plaintiff's allegations of disabling pain were not credible.  Plaintiff also faults the ALJ for failing to mention Plaintiff's obvious obesity, a condition that lends credibility to his claims of disabling pain for his rheumatoid arthritis not only when standing or walking, but also when sitting.  Acknowledging that his counsel at the hearing did not bring up Plaintiff's obesity, Plaintiff maintains that the ALJ had his own duty to fully and fairly develop the record on this matter.

In *Polaski v. Heckler*, 739 F.2d 1320, 1332 (8th Cir. 1984), the Eighth Circuit held

that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints."  The ALJ must also consider "observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions."  Id.

"If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001).  Furthermore, "the ALJ may properly discount the claimant's testimony where it is inconsistent with the record." *Teague*, 638 F. 3d at 615 (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004).  Upon review of the record, the Court concludes that the ALJ adequately considered the evidence before deciding that Plaintiff's subjective statements of disabling pain were not fully credible, and that this decision was supported by substantial evidence.

Plaintiff argues specifically that the ALJ erred in relying on Plaintiff's statement that he walked several miles a day, as it was not clear whether he walked that distance all at one time or throughout the day.  However, the ALJ did not draw any improper references from Plaintiff's statement that he walked several miles a day.  Rather, the ALJ recognized that Plaintiff's ability to walk that distance was inconsistent with his allegations of completely disabling limitations.  It is also significant to note that

18

Plaintiff's doctors recommended on several occasions that Plaintiff increase his daily activities.

Plaintiff asserts that the ALJ erred by not further restricting his abilities due to obesity.  However, as noted above, Plaintiff did not allege obesity in his application, or at his administrative hearing, as a basis for his disability.  An ALJ is under no "'obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'"  *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996) (quoting *Brockman v. Sullivan*, 987 F.2d 1344, 1348 (8th Cir. 1993)); *see also Robson v. Astrue*,  526 F.3d 389, 392-93 (8th Cir. 2008) (holding that the ALJ did not err in failing to include the plaintiff's obesity in the hypothetical question to the VE, where the claimant failed to claim obesity as a disabling condition); *Thompson v. Astrue*, 226 F. App'x 617, 620 (8th Cir. 2007) (same).  Additionally, Plaintiff does not explain how his obesity imposes further limitations than those assessed by the ALJ's RFC.  *See Robson*, 526 F.3d at 393.

**ALJ's Alleged Bias**

Plaintiff claims the ALJ has a known bias against Social Security disability claimants who are obese and allege mental impairments.  In support of this claim, Plaintiff has submitted statistics based on this ALJ's decisions in the 59 cases in which the law firm representing Plaintiff represented the claimant.  These statistics show that of the 59 cases, there was a favorable-decision rate of 38.9 percent, as compared to a national favorable-decision rate of 62 percent.  The statistics also show that a large

percentage of the ALJ's unfavorable decisions were cases involving obese females. Plaintiff has also submitted the favorable/denial rates of all Social Security ALJs in St. Louis for the year 2006, with the ALJ in the present case having the lowest rate of favorable decisions.

In an administrative hearing, as in a judicial proceeding, a party has a due process right to be heard by an impartial decision maker. *Keith v. Massanari*, 17 F. App'x 478, 481 (7th Cir. 2001). ALJs are presumed to be unbiased, although this presumption can be rebutted by showing a conflict of interest or some other specific reason for disqualification. *Rollins v. Massanari*, 261 F.3d 853, 857-58 (9th Cir. 2001). To show bias, a claimant must demonstrate that the ALJ's behavior, in the context of the whole case, "was so extreme as to display [a] clear inability to render fair judgment." *Id.*; *Waters v. Astrue*, 2:09 CV 28 DDN, 2010 WL 2522702, at *14 (E.D. Mo. June 16, 2010).

In this case, the ALJ afforded Plaintiff a 50-minute hearing. (Tr. at 28-75). None of the ALJ's comments or questions during the hearing can be seen as showing bias or disrespect to Plaintiff, and further, nothing in the ALJ's written opinion displays a bias against Plaintiff's claims. There is nothing showing that Plaintiff did not receive a fair hearing. Based on similar statistics to those presented here, other Courts in this District have rejected claims of bias by the ALJ. *See Bowen v. Astrue*, 2:09 CV 39 DDN, 2010 WL 2653458, at *17 (E.D. Mo. June 29, 2010); *Waters*, 2010 WL 2522702, at *14. And more recently, in *Perkins,* 2011 WL 3477199, at *8, the Eighth Circuit, upon de novo

20

review, affirmed this Court's rejection of a claim of bias against the same ALJ based upon similar statistics.  In sum, the Court finds that Plaintiff's claim of bias is without merit, and that the ALJ's decision is supported by substantial evidence in the record.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of September, 2011